UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK




FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 20 2017 ★
BROOKLYN OFFICE

---

UNITED STATES OF AMERICA

– against –

MICHAEL SCOTT,

          Defendant.

---

15-CR-382

Statement of Reasons Pursuant to
18 U.S.C. § 3553(c)(2)

JACK B. WEINSTEIN, Senior United States District Judge:

**Appearances**

**For United States:**

    Lauren Howard Elbert
    United States Attorney's Office
    Eastern District of New York
    271 Cadman Plaza East
    Brooklyn, NY 11201
    718-254-7577
    Fax: 718-254-6076
    Email: lauren.elbert@usdoj.gov

    Marcia Maria Henry
    United States Attorney's Office
    Eastern District of New York
    271 Cadman Plaza East
    Brooklyn, NY 11201
    718-254-6393
    marcia.henry@usdoj.gov

    Michael P. Robotti
    United States Attorney's Office
    Eastern District of New York
    271 Cadman Plaza East
    Brooklyn, NY 11201
    718-254-7576
    michael.robotti@usdoj.gov

**For Defendant:**

    Charles Samuel Hochbaum



Charles S. Hochbaum, P.C.
16 Court Street, Suite 1800
Brooklyn, NY 11241
718 855-4800
crimdefend@aol.com

Table of Contents

I.   Introduction ..................................................................................................................... 1
   A. Instant Offense ............................................................................................................. 1
   B. Arrest ........................................................................................................................... 2
   C. Guilty Plea .................................................................................................................. 2
   D. Sentencing Hearing ..................................................................................................... 2
II.  Offense Level, Category, and Sentencing Guidelines Range ....................................... 3
III. Law ................................................................................................................................ 3
IV.  18 U.S.C. § 3553(a) Considerations ............................................................................. 4
V.   Sentence ........................................................................................................................ 9
VI.  Conclusion .................................................................................................................. 10

I. **Introduction**

Defendant pled guilty to one count of conspiracy to distribute and possess with intent to distribute heroin pursuant to 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C). *See* Guilty Plea Transcript, July 1, 2016, ECF No. 249 ("Pleading Tr."), at 22:23-23:6. He participated in a drug trafficking organization ("DTO") that distributed heroin in Queens, New York. Two defendants are currently awaiting trial, several have been sentenced and several more are awaiting sentencing.

On March 2, 2017, he was sentenced to time served of 20 months, supervised release for 3 years, and a $100 special assessment. *See* Sentencing Hr'g Tr., Mar. 2, 2017 ("Sent. Hr'g"), at 7:16-18, 19:12.

A. **Instant Offense**

Defendant is a forty-six year-old African American male, born in Queens, New York. Presentence Investigation Report ("PSR") at 2. In 2013, the Homeland Security Investigation ("HSI") and other law enforcement agencies began an investigation of narcotics and drug trafficking by Mr. Scott, together with Kamel Lambus, Stanley Fuller, Shavona Trappier, Shakeem Powell, Sean Brabram, Scott Williams, Tyrone Thomas, Andre Mitchell, Earl Davis, and Tyran Trotter ("defendants"). Allegedly, they were participating in a street gang called the

1

Paper Chasing Goons. PSR at ¶ 2. The DTO maintained access to narcotics and firearms; some of its members distributed heroin to a network of street sellers. *Id.* at ¶¶ 3-4. They sold heroin from several stash houses using a mobile telephone. *Id.* at ¶¶ 3-4.

Scott purchased heroin from Trappier, Powell, and Trotter and then sold it on the street. *Id.* at ¶ 8. The government describes Scott's role as that of "an independent drug dealer within the DTO—who did not supervise others or take direction from anyone." *Id.* Scott testified that he only knew a few of his co-defendants. *See* Sent. Hr'g at 10:17-22. He says he was an addict who used heroin, and distributed it to his friends with whom he had pooled money to make purchases for their own use. *Id* at 9:21-22.

### B. Arrest

Defendant was arrested by HSI agents on July 8, 2015, at his home in Queens, New York. No post-arrest statements were made. PSR at ¶ 7.

### C. Guilty Plea

On July 1, 2016, Mr. Scott pled guilty to one count of conspiracy to distribute and possess with intent to distribute heroin pursuant to 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C). *See* PSR at ¶ 1. This was a lesser included offense within Count One of an eight-count superseding indictment. *Id.* The offense carried a maximum term of imprisonment of 20 years. 21 U.S.C. § 841(b)(1)(C); PSR at ¶ 107. A special assessment of $100 is mandatory. 18 U.S.C. § 3013. A term of supervised release of no less than three years is required. 21 U.S.C. § 841(b)(1)(C); *see also* U.S.S.G. § 5D1.2(c). The government dismissed open counts in the underlying indictment. Sent. Hr'g at 18:17-22.

### D.   Sentencing Hearing

A sentencing hearing was conducted on March 2, 2017. *See generally* Sent. Hr'g. The hearing was videotaped to develop an accurate record of the courtroom atmosphere, as well as

some of the subtle factors and considerations that a district court must consider in imposing a sentence. *See* 18 U.S.C. § 3553(a); *In re Sentencing*, 219 F.R.D. 262, 264–65 (E.D.N.Y. 2004) (describing the value of video recording for the review of sentences on appeal).

## II. Offense Level, Category, and Sentencing Guidelines Range

Defendant's base offense level is 30, with a criminal history category of VI. *See* PSR at ¶¶ 50, 108. The base offense level is 30 because the offense allegedly involved between 1 and 3 kilograms of heroin. *Id.* at ¶ 50. The offense level was enhanced by two points for being a career offender pursuant to U.S.S.G. § 4B1.1. The offense level was decreased by three points pursuant to U.S.S.G. § 3E.1.1(a)-(b) for defendant's timely acceptance of responsibility. PSR at ¶¶ 57-58. The total adjusted offense level is 29. *Id.* at ¶ 59. The Guidelines imprisonment range is 151 to 188 months. *See* U.S.S.G. Ch. 5 Pt. A; PSR at ¶ 108. The parties do not object to this calculation. *See* Sent. Hr'g at 11:13-12:21.

Pursuant to the Supreme Court's decision in *United States v. Booker*, the Guidelines are advisory; a sentencing court may depart from them in the interest of justice as well as in light of other statutory concerns expressed in section 3553(a). *United States v. Booker*, 543 U.S. 220, 245-46 (2005); *see also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (footnote omitted) ("It is now, however, emphatically clear that the Guidelines are guidelines – that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.").

## III. Law

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the Sentencing Guidelines referred to in section 3553(a)(4) of title 18, the

court shall indicate the specific reasons for imposing a different sentence. *See* 18 U.S.C. § 3553(c)(2). These "reasons must also be stated with specificity in a statement of reasons form." *Id.* Even though the Guidelines are now advisory rather than mandatory, *Booker*, 543 U.S. at 245-46, the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2). *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006).

The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007). Such a statement should demonstrate that the court "'considered the parties' arguments' and that it has a 'reasoned basis for exercising [its] own legal decisionmaking authority.'" *Cavera*, 550 F.3d at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)).

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, parsimony in incarceration is to be prized. *See, e.g.*, 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary."); National Research Council of the National Academies, *The Growth of Incarceration in the United States, Exploring Causes and Consequences*, 8 (2014) ("*Parsimony*: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

## IV. 18 U.S.C. § 3553(a) Considerations

The court considered the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Mr. Scott was born in 1970 in Queens. PSR at ¶ 78. His parents separated in 1994 or 1995. *Id.* His father worked as a stock clerk worker until 1978, when he stopped working

4

because of crippling arthritis. His father also suffers from high cholesterol and high blood pressure; he receives disability benefits for support. *Id.* His mother is a retired school safety officer. She is a breast cancer survivor who currently suffers from diabetes and relies on her pension for support. *Id.* Both of his parents are aware of defendant's conviction and are supportive. *Id.*

Defendant has four siblings. *Id.* at ¶ 79. His oldest brother resides in California with his wife and two children and is a retired construction worker. *Id.* Another brother is divorced with one child and lives in North Carolina. *Id.* His third brother has two children, lives in Queens, New York, and works in maintenance for the Bronx Zoo. *See id.* Defendant's sister, the youngest of his siblings, lives in Texas with her husband and two children, where she works as an accountant. *Id.* His siblings are aware of his conviction and are supportive. *Id.*

Mr. Scott has four children. Two of his children are from a past marriage to Lois Deale. These children are ages 20 and 19. *Id.* at ¶ 81. Defendant's criminal record shows he had altercations with his ex-wife in 1997 and 1998. *Id.* Ms. Deale said they divorced for "personal reasons" and stated that the defendant had always paid child support payments. *Id.* at ¶ 82. She describes Mr. Scott as very close with their children and as a "good person and father." *Id.* Mr. Scott has two other daughters, ages 7 and 6, from a relationship with Katherine Kerr, whom he dated for a number of years. *Id.* at ¶ 83. They separated in 2014 because she was a drug abuser (heroin and prescription pills), and he has not spoken with her since 2015. *Id.* Mr. Scott has custody of both children because Kerr was determined by a court to be unfit. *Id.* One child is under the care of her maternal grandparents, and the other child is under the care of defendant's mother, who relies on her modest pension plan for financial support. *Id.* Defendant's mother is

experiencing financial difficulty caring for defendant's child and struggles to care for this "energetic" child. *Id.* at ¶¶ 83-84.

Defendant describes his childhood as "difficult." *Id.* at ¶ 80. It is noted that from a young age he suffered from behavioral problems, making it hard for him to concentrate in school. *Id.* At the age of eleven or twelve, defendant was sexually abused while spending a summer with a host family he lived with while participating in the Fresh Air Fund. *Id.* Defendant did not tell anyone about the sexual abuse until he was fourteen or fifteen, when he received drug treatment counseling at the Phoenix House. *Id.* The host family who abused him was responsible for introducing the defendant to marijuana. *Id.*

Mr. Scott states that he graduated in 1988 or 1989 from the John F. Kennedy High School, in the Bronx, through a program offered by the Phoenix House Academy. PSR at ¶ 98. The Academy is a residential substance abuse facility with an on-campus high-school. *Id.* Defendant also has a culinary degree. *See* Sent. Hr'g at 16:24-25; PSR at ¶¶ 96-97. His mother corroborates that Scott attended the French Culinary School in Manhattan for a few months before discontinuing because of tuition expense, and that in 1990s he graduated from the Culinary and Management course offered by the New York Food and Management School in New York. *Id.* Defendant testified that he worked as a sales and marketing consultant for six years prior to his arrest; he maintains that this position will be available for him upon his release. *Id.* at ¶ 101; Sent. Hr'g at 7:21-8:3.

Defendant has a history of substance abuse. He began smoking marijuana at the age of eleven and smoked the drug until 2015. PSR. at ¶ 91. He said that he ingested cocaine for the first time at the age of sixteen or seventeen, and continued to use one to two grams a day until the date of his arrest. *Id.* In 2005, Mr. Scott began taking prescription painkillers such as

Oxycodone and Percocet for pain following a knee replacement surgery. *Id.* He said that he became dependent on the painkillers, which eventually lead to his heroin addiction. Sent. Hr'g at 13:13-17. He ingested 15-20 pills a day until 2015. PSR at ¶ 91.

At age forty-five, defendant first used heroin because it was cheaper than prescription drugs. *Id.* He quickly became addicted and was using $200 worth of heroin a day when he was arrested. *Id.* Defendant also testified to having problems with excess alcoholism in the past. *Id.*; Sent. Hr'g at 11:24-25.

The abuse of prescription medication is a matter of deep concern. It is increasingly common. Widespread prescribing of opioids for chronic pain, despite many known and unknown risks, has made these drugs readily accessible. *Prescribing Opioids*, CENTER FOR DISEASE CONTROL AND PREVENTION https://www.cdc.gov/drugoverdose/opioids/prescribed.html (last updated Mar. 16, 2016). Opioids killed over 33,000 people in 2015. Half of those deaths were caused by prescription medications such as Oxycodone or Percocet. This is a record-breaking number of deaths. *Understanding the Epidemic*, CENTER FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/drugoverdose/index.html (last updated Feb. 9, 2017). Pain-related health problems do not vary much per capita in states. There is no explanation for why doctors in one state prescribes more painkillers than another. But states with higher numbers of pain related prescriptions are associated with more overdose deaths. *Opioid Painkiller Prescribing*, CENTER FOR DISEASE CONTROL AND PREVENTION (July 2014), https://www.cdc.gov/vitalsigns/opioid-prescribing/. Over-prescribing pain-management medication frequently results in improper use. The prevalence of such misuse is currently being classified as an epidemic. "In the 2013 and 2014 National Survey on Drug Use and Health (NSDUH), 50.5% of people who misused prescription painkillers got them from a friend or

relative for free, and 22.1% got them from a doctor." *Prescription Drug Misuse and Abuse*, SUBSTANCE ABUSE AND MENTAL HEALTH ASSOCIATION, https://www.samhsa.gov/atod/opioids (last updated Feb. 23, 2016).

As people continue to use painkillers, their bodies develop a tolerance, which causes them to either need more pills to feel the effect or to switch to a cheaper and more powerful substitute: heroin. *Id.* From 2000-2015, the rate of heroin related deaths in the United States has more than quadrupled, with more than 12,989 killed in 2015. *Understanding the Epidemic*, CENTER FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/drugoverdose/index.html (last updated Feb. 9, 2017). The high correlation between prescription painkillers and heroin use—which often leads to incarceration—is directly attributable to the wide availability and over-prescription of opiate medications.

Mr. Scott is a victim of this growing trend. His use of heroin and participation in the DTO as a "buyer" can be traced back to his knee injury and subsequent Oxycodone and Percocet prescriptions. Sent. Hr'g at 13:13-17; PSR. at ¶ 91. He stated that his involvement in the DTO was merely as a consumer, not as a co-conspirator. Sent. Hr'g at 9:19-24.

Mr. Scott does not know any of his co-defendants, with the exception of one he recognizes as an individual who sold him heroin. *Id.* Defendant maintains that he purchased the drug solely for personal use to feed his addiction. *Id.* His purchasing pattern involved collecting money from his friends (who also used heroin), using the aggregated proceeds to purchase the drug in bulk, and then distributing the drugs to those who contributed. *Id.* Mr. Scott contends, appropriately, that his introduction to and subsequent addiction to heroin is the "all-too-common-story" where prescription medication played the role of a gateway drug. *Id.* While incarcerated, Mr. Scott underwent methadone treatment. *Id.*; PSR at ¶ 93. He says he is no longer using or

interested in using drugs, but he wants further substance abuse counseling. Sent. Hr'g at 14:22-15:9; PSR at ¶ 94.

Mr. Scott has a stable family, he is a skilled member of society holding a Culinary degree, and has a job awaiting him upon release. Sent. Hr'g at 7:21-8:3. He has faced problems that are typical of a common addiction. He has repeatedly accepted responsibility for his offense, PSR at ¶¶ 57-58, and recognizes the impact and burdens placed on his family, the government, and the court by his actions. Sent. Hr'g at 17:2-15.

No application for bail was ever made to the court. *Id.* at 18:3-9. Such an application would likely have been granted. Though an addict, Mr. Scott had relative stability in his life through his job and his family. Substance abuse treatment could have been provided through Pretrial Services. Allowing the defendant to remain free on bail would have been better and less costly for him, his family, his community, and the government.

V. **Sentence**

Under section 3553(a)(2)(B) of title 18, a sentencing court must consider two major factors: general and specific deterrence.

In light of the nature of the offense and the characteristics of the defendant, Mr. Scott is sentenced to time-served—approximately 20 months. *See* Sent. Hr'g at 19:12. A $100 special assessment is imposed. 18 U.S.C. § 3013. No fine is required in light of the defendant's inability to pay one. *See* Sent. Hr'g at 7:16-18; PSR at ¶ 106. Three years of supervised release was ordered. *See* Sent. Hr'g at 11:13-15. While on supervised release, Scott shall be subject to search conditions, shall not possess a firearm or ammunition, shall not associate with criminals or illicit drug users, and shall be provided with substance abuse treatment.

General and specific deterrence are achieved by the sentence imposed. Mr. Scott pled guilty to a serious offense. He has expressed genuine remorse for his conduct and understands

the gravity of his actions. His strong family support and good job prospects make recidivism unlikely.

## VI. Conclusion

All relevant elements of the Guidelines and statutes have been considered. Respectful consideration was given to the Sentencing Commission's policy statements, and all other factors listed under section 3553(a) of title 18, to ensure that the sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

SO ORDERED.

*Jack B. Weinstein*
Jack B. Weinstein
Senior United States District Judge

Dated: March 8, 2017
Brooklyn, New York